# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| BRENDA W. DIXON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case number 1:05cv0082 TCM |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405 (g) for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying Brenda W. Dixon's application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383b. Ms. Dixon ("Plaintiff") has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer.[1]

## Procedural History

Plaintiff applied for SSI in October 2002, alleging a disability since October 1982 caused by bilateral carpal tunnel syndrome and injuries to her right knee, hand, arm, hip, and shoulder, her left hip, and her upper back. (R. at 60-62.)[2] Her application was denied initially and following an administrative hearing before Administrative Law Judge ("ALJ")

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

Craig Ellis.  (Id. at 11-17, 37-41.)  The ALJ determined that Plaintiff was not under a disability at any time on or before the date of his decision, and denied her application.  (Id. at 13-19.)  The Appeals Council denied review of that decision, effectively adopting the decision as the final decision of the Commissioner.  (Id. at 2-4.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Frank Hart testified at the administrative hearing.  Before the hearing started, her counsel advised the ALJ that Plaintiff had received SSI from October 1982 to March 1997, when she was notified that she was no longer considered disabled.  She did not appeal at decision.

Plaintiff testified she was born on October 5, 1952, and was then 51 years' old.  (Id. at 155.)  She was 5 feet 5 inches tall and weighed 155 pounds.  (Id. at 156.)  She had completed the twelfth grade, and was right-handed.  (Id. at 155.)  She was divorced and was temporarily living in a friend's basement after being evicted the week before from a house she and another friend, Frank Hart, had bought together five years ago.  (Id. at 155, 161-62.)  She had no money.  (Id. at 156.)  She had not applied for food stamps because she had no kitchen.  (Id.)  She did not have any health insurance or Medicaid.  (Id. at 160.)

On January 25, 2002, she and Mr. Hart were in an automobile accident.  (Id. at 157, 162.) Another driver hit them head-on.  (Id. at 157.)  They are looking for an attorney to file suit on their behalf.  (Id.)

Plaintiff explained that her earlier SSI benefits were awarded on the basis of carpal tunnel syndrome.  (Id. at 159.)  The benefits stopped on the grounds that she was working.

(Id.) Specifically, it was alleged she was working at Mr. Hart's body shop. (Id. at 165.) She was not; indeed, she had not worked since 1982. (Id. at 159, 166.) She suspected Mr. Hart's ex-wife of lying to Social Security about her working. (Id. at 168.) She spoke with several attorneys about appealing the decision, but they all wanted retainers and she did not have the necessary money. (Id. at 160.) She did not know she could appeal on her own. (Id. at 166.)

Asked how she supported herself between 1997 and the present, Plaintiff testified that she had sold off some personal property and had been helped by Mr. Hart. (Id. at 160, 162.) The house they had bought together had her name on the deed and his name on the promissory note. (Id. at 163.) Mr. Hart had filed for bankruptcy to protect the house, but it went into foreclosure anyway. (Id. at 163-64.) An attorney had been hired to file the necessary schedules and other paperwork. (Id. at 164.) The attorney did not do so. (Id.)

Asked why she could no longer work as a clerical clerk typist as she had in 1982, Plaintiff explained that pain and numbness in her hands prevented her from holding on to anything very long. (Id.) Also, she had trouble doing things like drying her hair, brushing her teeth, or getting dressed. (Id.) It was "almost impossible to write"; she could not type. (Id. at 165.) She had trouble driving and had to switch hands; turning was a problem. (Id. at 168.)

Plaintiff further testified that she has pain in her hip and carpal tunnel syndrome. (Id. at 169.) The carpal tunnel is worse than what it was when she was receiving disability. (Id.) She now has knots at the base of the thumbs in both hands. (Id. at 169-70.) It feels like her

hands are in scalding water. (Id. at 170.) She has a condition, keloid, that causes her to develop scar tissue. (Id.)

She broke her right foot and injured her left hip and right shoulder in the automobile accident. (Id. at 171.) She has not been able to get medical treatment to figure out what is wrong with the hip and shoulder. (Id.) After the accident she was taken to an emergency room and her right foot was placed in a soft cast. (Id.) Her foot did not heal properly; it is still swollen and painful to walk on. (Id. at 172.) Her hip hurt all the time. (Id.) She can stand for only a few minutes before having to sit down; she cannot sit down for longer than 15 minutes before having to get up and move around. (Id.) She cannot sleep because of the pain in her hip and shoulder. (Id. at 173.) She cannot pick up anything heavy, not even a gallon of milk. (Id.)

Additionally, Plaintiff had become depressed after the first injuries to her wrist. (Id. at 174.) She is anxious, unable to sleep, and cries easily. (Id.) She also has panic attacks that cause her to hyperventilate every day or two. (Id. at 174-75.) She becomes frustrated and does not like to be around people. (Id. at 175.)

She has no money or medical insurance to pay for health care. (Id. at 172.)

Mr. Hart testified that the automatic stay was lifted in his bankruptcy case to allow the mortgage company to foreclose on the house. (Id. at 176.) He hired another attorney after the first one failed to file the bankruptcy papers for him. (Id. at 176-77.) The first attorney also kept the money paid in settlement of his claim arising out of the automobile accident. (Id. at 178.) Thus, the attorney got $75,000 for both Plaintiff's and Mr. Hart's

claims and did not give Mr. Hart a penny.  (<u>Id.</u> at 178-79.)  Plaintiff's portion was $1,500.

(<u>Id.</u> at 180.)  Mr. Hart has hired another attorney to finish the bankruptcy and to get his

money back from the first one.  (<u>Id.</u> at 179.)

Mr. Hart testified that he has known Plaintiff for 12 years.  (<u>Id.</u> at 182.)  She slept

until noon because her hands and wrists would not move until then.  (<u>Id.</u>)  She could not

write because of the pain.  (<u>Id.</u>)  Her carpal tunnel problem was worse than in 1997, and she

had knots on her hand she did not have then.  (<u>Id.</u> at 185.)  She would occasionally drop

things.  (<u>Id.</u>)  Plaintiff continued to have problems with her foot.  (<u>Id.</u> at 186.)  Asked about

her hip, Mr. Hart simply replied, "No."  (<u>Id.</u>)  Asked about her right hip, he answered that

it was very painful at times and made it hard for Plaintiff to walk.  (<u>Id.</u>)  She also has a lot

of pain in her right shoulder.  (<u>Id.</u>)  He has noticed her depression; it is part of the cause for

her staying in bed until noon.  (<u>Id.</u>)  He has seen her hyperventilate and cry often.  (<u>Id.</u> at

187.)

Mr. Hart further testified that Plaintiff was not working for him in 1997 as alleged.

(<u>Id.</u> at 182.)

At the conclusion of the hearing, the ALJ stated that he would hold the record open

to allow counsel to develop the record on the previous claim and that a psychological

evaluation would be arranged.  (<u>Id.</u> at 187.)

<u>**Medical and Other Records Before the ALJ**</u>

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; documents generated pursuant to that record; medical records; and medical evaluation reports.

On a "Disability Report: Adult" form, Plaintiff listed bilateral carpal tunnel syndrome and "automobile wreck injury" to right foot, shoulder, hand, arm, and hip, left hip, and upper back as the impairments that prevented her from working. (Id. at 90.) These impairments first bothered her on October 12, 1982, and also prevented her from working that same day. (Id.) The pain and numbness in her hands prevented her from writing or typing for very long and from lifting at all. (Id.) She listed three health care providers and two hospitals as sources for information about her impairments. (Id. at 92-94.) The providers were Dr. Thomas Clay, first seen on October 13, 1982, and last seen in 1988; Dr. Joseph Sedgewick, seen in November 1982 after a fall down a flight of stairs; Dr. Bud Cameron, first seen in October 1982 and last seen in November 1997; Barnes Hospital, where tests were conducted in October 1982 for her carpal tunnel syndrome; and Lucy Lee Hospital, where she was treated in the emergency room following the automobile accident. (Id.) Under "Remarks," she listed three hospitals: Barnes Hospital; Wood River Hospital; and St. Elizabeth's Hospital. (Id. at 97.) A DDS secretary's notes report that Barnes Jewish Hospital had no records for Plaintiff after 1986 and St. Elizabeth's Hospital had no records for her after January 3, 1993. (Id. at 80.) The telephone number for Wood River Hospital was no longer in service. (Id.)

On a "Work History Report," Plaintiff listed four jobs. (<u>Id.</u> at 81.) Her last job was as a hospital clerk and ended in 1982. (<u>Id.</u>) On a separate form, Plaintiff listed two medications, Tylenol P.M. and Aleve. (<u>Id.</u> at 67.) She took two of each at bedtime, and she took additional dosages of the Aleve during the day as needed. (<u>Id.</u>) Her earnings record lists income in only three years after 1982: $23.60 in 1989; $93.50 in 1990; and $597.00 in 1992. (<u>Id.</u> at 51.)

A "Report of Contact" was included in the file to note the substance of a telephone conversation the Disability Determinations Services ("DDS") counselor had had with Plaintiff on January 3, 2003. (<u>Id.</u> at 77-78.) Plaintiff was described "as almost hostile in her responses." (<u>Id.</u> at 77.) She explained her failure to earlier return the counselor's telephone call by reporting that she had had the flu for the past twenty days. (<u>Id.</u>) The counselor did not consider Plaintiff "very credible" in her responses to the counselor's inquiries about her activities of daily living. (<u>Id.</u>) For instance, Plaintiff could not name the physician who had diagnosed her carpal tunnel syndrome, dated the diagnosis from "years ago," and reported that her whole hands were numb. (<u>Id.</u>) She denied the use of over-the-counter medication. (<u>Id.</u>) She did nothing during the day, including not eating with the exception of the occasional dollar hamburger. (<u>Id.</u>) She did not know how much she weighed. (<u>Id.</u>) She showered once a week and always wore pajamas. (<u>Id.</u>) When the counselor noted that Plaintiff had been able to hold the telephone receiver during the entire conversation, Plaintiff was heard asking someone else to hold the phone for her. (<u>Id.</u>) A few seconds later, Plaintiff was again holding the receiver. (<u>Id.</u>)

Plaintiff's medical records are those generated after her automobile accident on January 25, 2002, and the reports of two evaluations performed pursuant to her SSI application.

Soon after before midnight on January 25, 2002, Plaintiff was taken to the emergency room at Three Rivers Healthcare following a head-on automobile accident.  (Id. at 124-25.) She reported to the emergency medical technicians moderate pain to her left hip and extreme pain to her right femur, knee, lower leg, ankle, and foot.  (Id. at 125.)  Her right ankle was deformed; her right foot was swollen.  (Id.)  At the emergency room, she complained of pain in her right ankle, leg, heel, knee, and wrist and in her left hip.  (Id. at 114-21, 126-32.[3])  The initial assessment of the pain was that it was a ten on a scale of one to ten and the pain was worse in her right ankle.  (Id. at 115.)  The emergency room physician rated the severity of her pain as moderate and the source as her right wrist and ankle.  (Id. at 117.)  She was alert and oriented times three; her sensory and motor systems were within normal limits.  (Id.) X-rays revealed a "minimally displaced mid body [sic] fracture of the calcaneus [a bone in the lower and back part of the heel of the foot]" in her right foot; soft tissue swelling in her right ankle; and arthritis in the first carpal-metacarpal joint in her right wrist.  (Id. at 128.) An x-ray of her pelvis was normal, as was one of her chest.  (Id. at 129.)  An electrocardiogram was also normal.  (Id. at 132.)  The diagnosis was a sprain to her right ankle; an airsplint was applied and she was given Vicodin.  (Id. at 116, 118.)  On discharge

---

[3]These pages are duplicated in the administrative record at pages 138 to 149, inclusive.  Pages 122 and 123 are the ambulance records for Mr. Hart.

a few hours later, Plaintiff's condition had improved and was stable. (Id.) She was ambulatory. (Id.)

One year later, on January 30, 2003, Plaintiff underwent a consultative examination by D.K. Varma, M.D. (Id. at 133-136A.) Her chief complaints were as follows:

> Pain all over the body from a motor vehicle accident in 1982. She was not hospitalized. She broke her right heel and it was put in a cast. She claims ever since this accident she has pain from her head to her toes, worse are the right heel, right hip, right shoulder and left hip. This is a dull aching constant pain that is present almost all of the time without any aggravating or precipitating factors. She has taken Alleve [sic] which has seemed to help her pain to a certain degree, but not enough to control the pain entirely. She cannot walk more than a block on a level, cannot stand any length of time, cannot sit in one position and has to change her position every now and then, cannot lift any weight because of her pain. She stays at her home without doing much activity, and her friends help her with her household chores. Pain in her thoracic spine with a funny feeling following the motor vehicle accident. It is accompanied by numbness and tingling of pain off and on for a number of years with occasional wheezing. There is [sic] no chills, fever, shortness of breath or swelling of the legs and feet. . . .

(Id. at 133.) Her past history included a 20-foot fall in 1982, resulting in minor injuries and lacerations to her left thumb. (Id.) She had been married once and divorced in 1989; her one child had been missing since he was 17 years' old. (Id. at 134.) Plaintiff reported that she had gained approximately 30 pounds in the past year because of inactivity. (Id.) She weighed 178 pounds. (Id.) She also reported that she had an ulcer, but it no longer bothered her. (Id.)

On examination, Plaintiff did not look "sick acutely or chronically." (Id.) There were no abnormalities in her head, eyes, ears, nose, throat, neck, mouth, teeth, cardio-respiratory system, gastro-intestinal system, genito-urinary system, cardio-vascular system, respiratory

system, abdomen, or neurological system. (<u>Id.</u> at 134-35.) "Movements of all the extremity joints exhibit full range of movement and painless." (<u>Id.</u> at 135.) There was "[t]enderness in her right heel with normal range of motion of both the ankles, shoulders, right hip and left hip." (<u>Id.</u>) The range of motion in her back was also normal, although there was mild tenderness in her mid-thoracic spine. (<u>Id.</u>) Her grip strength and fine finger movements were normal, although they were slow. (<u>Id.</u>) Her gait was also normal; she did not use any assistive devices. (<u>Id.</u>) "There [was] no evidence of neurological abnormality." (<u>Id.</u>) She had moved to Poplar Bluff from St. Louis; she had friends in St. Louis and was socially active. (<u>Id.</u>) Dr. Varma's impression was of "[d]iffuse musculo-skeletal pain, cause undetermined" in addition to the impairments revealed in the 2002 x-rays. (<u>Id.</u>)

Bridget Hurt, Psy.D., evaluated Plaintiff in April 2004. (<u>Id.</u> at 103-09.) Plaintiff told Dr. Hurt that she believed her disability had been stopped because someone had reported that she had been working when she had not been and that the code for the reason for the cessation had been changed since she had initially inquired about it. (<u>Id.</u> at 103.) She had gone to the Division of Family Services to inquire about assistance several years ago and had been laughed at. (<u>Id.</u>) Because of the pain and numbness in her arms, she was unable to brush her teeth or go to the bathroom in the morning for several hours. (<u>Id.</u>) Additionally, she had neck pain from an automobile accident when she was 15. (<u>Id.</u>)

Plaintiff further reported that she was depressed every day. (<u>Id.</u>) She attributed the depression to her being disabled and with no money. (<u>Id.</u>) She also had a child missing since 1988, when he was 15 years' old. (<u>Id.</u> at 103, 104.) She felt suicidal during her divorce

and when her son disappeared the following year.  (Id. at 103.)  She had attempted suicide

when she was a teenager.  (Id.)  She had not been taken to the hospital, however, and "simply

slept."  (Id.)  She had no ongoing suicidal thoughts.  (Id.)  On her worst days, she stayed in

bed.  (Id.)  She has trouble falling asleep, going to bed around between 11 o'clock and

midnight and not going to sleep until 3 o'clock in the morning.  (Id. at 104.)  Pain in her

arms, shoulder, hip, and neck wakes her up.  (Id.)  She has trouble concentrating and reading.

(Id.)  And, "she is more forgetful than usual."  (Id.)  Because of her physical problems, she

has lost interest in riding motorcycles, gardening, and traveling.  (Id.)

Plaintiff attributed the beginning of her problems to a fall down the stairs at work in

1982.  (Id.)  She was later diagnosed with carpal tunnel syndrome, which prevented her from

working as a typist.  (Id.)

Asked about her daily activities, Plaintiff reported that she spent the day lying in bed

or sitting.  (Id.)  She occasionally watched television.  (Id.)  She did not do any household

chores.  (Id.)  No one in the house cooked so everyone there ate out and brought food home.

(Id.)  She had attended some college and had made A's.  (Id.)  She quit to get married.  (Id.)

Dr. Hurt noted the following about Plaintiff's mental status examination:

> [Plaintiff] appeared neat and clean in appearance wearing fashionable
> clothing and exhibited adequate personal hygiene.  Her facial expressions were
> appropriate and eye contact adequate. . . .  Her affective responses were
> congruent and speech was clear, logical, and coherent.  She seemed a bit
> suspicious as she talked about the person who allegedly made the false
> allegation that she was working and cost her her disability check.  There was
> no other evidence of unusual thought patterns.  She was oriented to person,
> time, place, and circumstances.  She denied suicidal ideation. . . .  Her abstract
> conceptual thinking was also basically intact . . .  Memory functions were

impaired as she was able to recall only one of three words after approximately five minutes . . .

Social judgment skills were also mildly impaired . . .

[Plaintiff] appeared to be functioning in at least the average range of intelligence . . .

(Id. at 105-6.)

Plaintiff's scores on the Minnesota Multi-phasic Personality Inventory, Second ("MMPI 2") indicated that she "experiences a depressed mood and may be pessimistic. She may be overly concerned about physical complaints and may be cynical and whiny." (Id. at 106.) She appeared to have problems with authority and be introverted, shy, and socially insecure. (Id.) Additionally,

[a]lthough the validity scale suggested that there may be some questionable validity, it is likely there was some exaggeration as [Plaintiff] had some extreme scores on the MMPI 2 while she did not appear excessively anxious or depressed in the interview as she was able to maintain appropriate social conversation, demonstrated no physical symptoms of anxiety, and was not tearful. This is not congruent with the extreme elevations found on the MMPI 2. The reason for this likely exaggeration is not know and could be a plea for help.

(Id.)

Dr. Hurt's diagnosis was adjustment disorder with depressed mood and dysthymic (less severe depression than that considered to be major depression) disorder. (Id. at 107.) She assessed Plaintiff's current Global Assessment of Functioning ("GAF") as 65.[4] (Id.)

---

[4]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003). See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The

Rating Plaintiff's ability to do mental work-related activities, Dr. Hurt reported that Plaintiff's mental impairments moderately affected her ability to understand and remember detailed instructions, slightly affected her ability to carry out detailed instructions, but did not affect at all her abilities to understand, remember, and carry out short, simple instructions. (Id. at 108.) Her "ability to respond appropriately to supervision, co-workers, and work pressures in a work setting" was not affected by her mental impairment, nor were any other capabilities affected. (Id. at 109.)

## The ALJ's Decision

Noting that the record had been held open to give counsel an opportunity to obtain additional medical records and to secure a consultative psychological examination of Plaintiff, the ALJ further noted that the only medical records submitted were those of Three Rivers Healthcare and that counsel had not objected to the examination. (Id. at 11-12.) The ALJ then proceeded to summarize the record and evaluate Plaintiff's credibility.

The ALJ found that, during the period in question, Plaintiff had had minimal medical treatment, including no consistent physical therapy, surgical intervention (including no carpal tunnel release surgery), pain management, and mental health services. (Id. at 13.) This lack of treatment detracted from her credibility. (Id.) Although she alleged disabling orthopedic

---

GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Manual at 34.

pain, she took only over-the-counter medications. (Id.) This inconsistency was another detraction. (Id.) Addressing Plaintiff's contention that she did not have the finances for medical treatment or prescription medication, the ALJ noted that there was no evidence that she sought any low-cost medical treatment or that she was denied medical care because of her finances.[5] (Id.) "Additionally, Social Security Ruling 82-59 provides that a claimant must exhaust all free or subsidized sources of treatment and document her financial circumstances before inability to pay would be considered good cause for failure to follow through with treatment." (Id. at 13-14.)

The ALJ further found that the results of Dr. Varma's examination were inconsistent with Plaintiff's complaints. (Id. at 14.) And, there were inconsistencies between Plaintiff's allegations and her behavior, as recorded in the "Report of Contact." (Id.) The results of the psychological examination, including the possibility of the results being exaggerated or fabricated, also supported a conclusion that she did not have a severe mental impairment. (Id. at 15.)

Consequently, the ALJ found "[Plaintiff's] testimony and allegations, with respect to the severity of her overall medical condition and inability to perform substantial gainful activity, not credible or supported by record." (Id.) Mr. Hart's testimony was also not supported by the record and not credible for the same reasons as was Plaintiff's. (Id.) The

---

[5]The ALJ referred to Plaintiff being unable to qualify for a Medicaid card. There was, however, no evidence that she had applied for one. There was evidence that she had not applied for food stamps because she had no kitchen; no question was asked about whether she had applied for Medicaid.

ALJ further found that Plaintiff's normal appearance and demeanor at the hearing were inconsistent with her complaints of disabling pain.

For the foregoing reasons, the ALJ concluded that Plaintiff's mental and physical impairments, singly or combined, were not severe as "[the] term is used in the regulations." (Id.)  Plaintiff was not disabled within the meaning of the Act.

### Discussion

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 416.920, 404.1520.  See also **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any

impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

The burden in these first steps, and also in step three and four, is on the claimant. See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh v. Apfel**, 222 F.3d 448, 451 (8th Cir. 2000).

In determining the severity of a claimant's impairments, the ALJ must evaluate the claimant's credibility regarding subjective pain complaints. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). And, although a claimant need not be reduced to life in front of the

television in order to prove that pain precludes all productive activity, see **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir. 1996), "[t]he mere fact that working may cause pain or discomfort does not mandate a finding of disability," **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (alteration added).

After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. <u>See</u> **Singh**, 222 F.3d at 452; **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998). The decision of an ALJ who seriously considers, "but for good cause expressly discredits, a claimant's subjective complaints of pain, is not to be disturbed." **Haggard v. Apfel**, 175 F.3d 591, 594 (8th Cir. 1999).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." **Cox**, 160 F.3d at 1206-07. When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite

conclusion. **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because (a) he failed to discuss her non-exertional impairments when evaluating her residual functional capacity ("RFC"); (b) he improperly evaluated her credibility; and (c) he failed to call a vocational expert to testify. The Commissioner disagrees.

Plaintiff misapprehends the nature of the five-step sequential evaluation. At the third step in the sequential evaluation process, the ALJ must determine whether the claimant's severe impairment meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ "reviews [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to

the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. <u>See</u> <u>also</u> 20 C.F.R. §§ 416.920(f), 404.1520(f). The Commissioner may meet her burden by referring to the medical-vocational guidelines or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219.

Thus, if there is substantial evidence on the record as a whole to support the ALJ's conclusion that Plaintiff did not have a severe physical or mental impairment or combination thereof, the sequential evaluation process properly ended at step two and the issues of her RFC and the need for vocational expert testimony do not arise. The answer to the question whether the ALJ's step two conclusion is adequately supported depends on his credibility findings.

One factor in the ALJ's adverse credibility findings is the lack of supporting objective evidence. This omission is a proper consideration. <u>See</u> **Stephens v. Shalala**, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); **Barrett v. Shalala**, 38 F.3d 1019, 1022 (8th Cir. 1994) (holding that the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ also properly considered Plaintiff's failure to take strong pain medication, see **Masterson v. Barnhart**, 363 F.3d 731, 739 (8th Cir. 2004), and the evidence that she took only over-the-counter medication, see **Harris v. Barnhart**, 356 F.3d 926, 930 (8th Cir. 2004). Plaintiff's demeanor at the hearing was also a proper

consideration, see **Strongson v. Barnhart**, 361 F.3d 1066, 1072 (8th Cir. 2004); **Ply v. Massanari**, 251 F.3d 777, 779 (8th Cir. 2001); **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996), as was her failure to seek aggressive medical treatment, **id.** at 419.

Plaintiff argues, however, that the lack of medical treatment and strong pain medication are caused by her lack of money. "If a claimant truly has no access to health care, then the absence of such care would not tend to disprove her subject complaints of pain." **Harris**, 356 F.3d at 930. "But in evaluating the credibility of [a claimant's] subjective complaints, it [is] permissible for the ALJ to consider the lack of evidence that [the claimant] had sought out stronger pain treatment available to indigents." **Id.** (alterations added). Accord **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005); **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999). There was no evidence that Plaintiff had requested but been denied health care due to her indigency.

Additionally, there were inconsistencies in the record that detract from Plaintiff's credibility. For example, those inconsistencies include the failure to mention her carpal tunnel syndrome, the impairment for which she was found to be disabled in 1982, to Dr. Varma; the inconsistencies between her complaints of pain after the automobile accident and the description of that pain to Dr. Varma; the inconsistencies between her report to the DDS counselor that all she ate was a hamburger every couple of days and her weight gain of 30 pounds; the inconsistencies between her claim of being unable to hold anything for any length of time and her ability to hold the telephone receiver during the majority of her conversation with the DDS counselor; and the inconsistencies between her allegations of

depression and her appearance and demeanor at the consultative examinations and the hearing.

Plaintiff further argues that her mental impairments include adjustment disorder with depressed mood and dysthymic disorder. As noted by the Commissioner, however, these diagnoses were based on Plaintiff's complaints. See **Brown v. Chater**, 87 F.3d 963, 964 (8th Cir. 1996) (permitting ALJ to discount health care provider's statement as to claimant's limitations because such conclusion apparently rested solely on claimant's complaints); **Woolf v. Shalala**, 3 F.3d 1210, 1214 (8th Cir. 1993) (finding that ALJ could discount conclusory statement of disability based on claimant's subjective complaints). Moreover, the ALJ properly noted that Plaintiff's results on the MMPI-2 indicated a possible exaggeration of her symptoms.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision that Plaintiff did not have a severe impairment or combination thereof. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (alterations added) (interim citations omitted).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED

and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of August, 2006.